UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

RENEE SCHROEDER,                  )
                                  )
           Plaintiff,             )
      vs.                         )  CIVIL ACTION FILE
                                  )  NO. 1:14-CV-130-HLM
CALEB GILBERT, in his             )
individual capacity,              )
                                  )
           Defendant.             )


- - -


The deposition of OFFICER CALEB GILBERT, taken on
behalf of the Plaintiff, taken pursuant to notice and
agreement of counsel, taken for the purposes of
cross-examination and discovery and any other purpose
authorized by the Federal Rules of Civil Procedure;


the reading and signing of the deposition being


reserved; taken before Patricia M. Lesch, Certified


Court Reporter, commencing at 9:00 a.m., on the 31st


day of December, 2014, at 1809 Buford Highway, Buford,


Georgia.

```
1     APPEARANCES OF COUNSEL:

2     For the Plaintiff:

3              JEFFREY R. FILIPOVITS, Esq.
               2900 Chamblee Tucker Road, Building 1
4              Atlanta, Georgia 30341
               (770) 455-1350
5              jrfilipovits@gmail.com

6     For the Defendant:

7              AMY B. COWAN, Esq.
               Carothers & Mitchell, LLC
8              1809 Buford Highway
               Buford, Georgia 30518
9              (770) 932-3552
               amy.cowan@carmitch.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        C O N T E N T S

2                   E X A M I N A T I O N S

3                                                    Page

4    Cross-Examination by Mr. Filipovits..................4

5

6                       E X H I B I T S

7    Exhibit No.            Description            Page

8    P-1     45 C.F.R. 165.510(b)(3)                41

9    P-2     Communications Event Report            50

10   P-3     Communications CAD Report              52

11   P-4     Incident/Investigation Report          54

12   P-5     Google Map Reflecting Area of Traffic  54
             Stop

13

14   P-6     Criminal Arrest Warrant                56

     P-7     File Information on Renee Schroeder     56

15

16   P-8     Defendant's Objections and Responses   57
             to Plaintiff's Requests for Production

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2             MR. FILIPOVITS:  We're here for the
 3        deposition of Caleb Gilbert in the case of Renee
 4        Schroeder vs. Caleb Gilbert, Case No.
 5        4:14-CV-130-HLM in the Northern District of
 6        Georgia.
 7           This deposition is being taken pursuant to
 8        notice and with agreement of opposing counsel.
 9        We're going to reserve all objections save for
10        the dreaded objection to the form of the question
11        until the time of trial.
12             Would you please swear in the witness.
13             MS. COWAN:  He'll read and sign.
14             MR. FILIPOVITS:  Okay.
15   (Whereupon,
16             OFFICER CALEB GILBERT,
17        was called as a witness and having been first
18        duly sworn, was examined and testified as
19        follows:)
20                  CROSS-EXAMINATION
21   BY MR. FILIPOVITS:
22        Q.   Good morning, Officer Gilbert.
23        A.   Good morning.
24        Q.   Could you state your full name for the
25   record.
```

Officer Caleb Gilbert
12/31/2014

Page 5

1      A.   Caleb Gilbert.

2      Q.   All right.  Just some quick ground rules for

3  the deposition.  First one, if you need a break, just

4  let me know.  We'll finish up whatever questions we're

5  on and take a break.

6      A.   Yes, sir.

7      Q.   Let's see.  If I ask a question that you

8  don't understand, please ask me to rephrase.

9      A.   Yes, sir.

10     Q.   Please allow me to complete any question

11 before you give an answer for the court reporter's

12 benefit.

13     A.   Yes, sir.

14     Q.   And as you are already doing, please be sure

15 to answer yes or no if it calls for a yes or no

16 answer, just so the court reporter can take down your

17 response.

18     A.   Yes, sir.

19     Q.   Are you feeling comfortable today?  Anything

20 preventing you from --

21     A.   No, sir.

22     Q.   -- giving us your full attention?

23     A.   No, sir.

24     Q.   Okay.  Have you ever been deposed before?

25     A.   No, sir.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1       Q.   All right.  Did you review any materials in

2    preparation for this deposition?

3       A.   Yes, sir.

4       Q.   What materials were those?

5       A.   The report, video, and any photographs.

6       Q.   Okay.  And did you talk to any other

7    witnesses before you came to this deposition?

8       A.   No, sir.

9       Q.   All right.  I'm just going to go into your

10   background a little bit.

11      A.   Yes, sir.

12      Q.   Tell me how far you went in school.

13      A.   I'm currently pursuing a master's degree in

14   public administration.

15      Q.   Where are you doing that?

16      A.   Liberty University in Lynchburg, Virginia.

17      Q.   Is that a distance-learning course?

18      A.   That is, sir.

19      Q.   Okay.  And what is your bachelor's degree

20   in?

21      A.   Social science.

22      Q.   Where did you get that?

23      A.   Kennesaw State University.

24      Q.   What year?

25      A.   2005.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1        Q.    Attend any other colleges?

2        A.    University of Georgia.

3        Q.    Did you get a degree?

4        A.    No, sir.

5        Q.    What did you study there?

6        A.    Accounting.

7        Q.    How long were you there?

8        A.    A year.

9        Q.    And then you transferred to Kennesaw State?

10       A.    No.  It was after Kennesaw State.

11       Q.    Okay.  So this was like a postbaccalaureate

12    kind of class?

13       A.    Yes, sir.  It was a supplementary degree.

14       Q.    Okay.  Were you a police officer at that

15    time?

16       A.    No, I was not, sir.

17       Q.    When did you enter the Police Academy?

18       A.    2007.

19       Q.    And what prompted you to do that?

20       A.    I needed a job that was close to home, which

21    was Cobb County.

22       Q.    Are you from Georgia?

23       A.    I am.

24       Q.    Your family?

25       A.    Yes, sir.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

Page 8

1       Q.   Do you have any relatives who reside, we'll

2   say, in the northern portion of Georgia, so say from

3   Atlanta north?

4       A.   Yes, sir.

5       Q.   Okay.  I'm not really interested in names of

6   your relatives, but in case this case should ever get

7   to trial, for the purposes of jury selection, I just

8   need to know some of their names.

9       A.   Yes, sir.

10      Q.   So are your parents still here?

11      A.   Yes, sir.

12      Q.   Okay.  What are their names?

13      A.   Farish, F-A-R-I-S-H, Gilbert.  My mother's

14   name is Sandra, S-A-N-D-R-A.

15      Q.   All right.  Any siblings?

16      A.   Yes, sir.

17      Q.   And what are their names?

18      A.   Pamela Handy.

19      Q.   Is that H-A-N-D-Y?

20      A.   That's correct.

21      Q.   Okay.  Only your sister?

22      A.   Yes, sir.

23      Q.   And what's her husband's name?

24      A.   Jason.

25      Q.   Jason Handy?

Officer Caleb Gilbert
12/31/2014

1      A.   Yes, sir.  I think his actual legal name is

2    Mark, but he goes by Jason, so it may be Mark Jason

3    Handy.

4      Q.   Okay.  Aunts and uncles in the area?

5      A.   Yes, sir.

6      Q.   Could you give me their names.

7      A.   Richard and Patsy Hallford.

8      Q.   And are they -- it doesn't matter how

9    they're related.  Disregard that.

10     A.   Okay.

11     Q.   Other aunts and uncles?

12     A.   Yes, sir.

13     Q.   Okay.  How many are we talking about here?

14     A.   Three.

15     Q.   Three, okay.  Are they in Georgia?

16     A.   They are.

17     Q.   Okay.  Let me have their names too.

18     A.   Well, three sets, I should say.  You have

19    Larry and Barbara Gilbert, Evelyn and Everett

20    Brackett, and actually the third one is out of state,

21    in Texas.

22     Q.   Okay.  Grandparents?

23     A.   All deceased.

24     Q.   And certainly you don't have any kids.  If

25    you do have kids, they're all minors, I assume?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1          A.    I don't have kids.

2          Q.    No kids, all right.  So you entered the

3     academy in 2007.  Did you have a job when you entered

4     the academy, with the department, or did you enter

5     without being hired first?

6          A.    No, I had a job with the department.

7          Q.    Which department?

8          A.    Cobb County Police Department.

9          Q.    Okay.  When did you graduate from the Police

10    Academy?

11         A.    October of 2007.

12         Q.    And then how long were you with Cobb County?

13         A.    I was with Cobb County for a total of five

14    years; however, there was a brief stint after the

15    academy where I took a job with an electrical

16    contracting company for six months.

17         Q.    Did you take a leave of absence from Cobb

18    County at that point?

19         A.    No, sir, I just left the job.

20         Q.    Okay.  Then when you came back, did you come

21    back to Cobb County?

22         A.    I did.

23         Q.    What caused you to leave the job?

24         A.    It was a job offer by my father-in-law and

25    his company.

Officer Caleb Gilbert
12/31/2014

1    Q.    No problems with working at Cobb County?

2    A.    No, sir.

3    Q.    And then what caused you to go back, to

4    return to Cobb County?

5    A.    I enjoy police work.

6    Q.    Okay.  Have you worked anywhere else besides

7    Cobb County and the City of Dunwoody?

8    A.    No, sir.

9    Q.    What caused you to move to working for the

10   City of Dunwoody?

11   A.    Better pay and benefits.

12   Q.    What's your current rank?

13   A.    Patrol officer.

14   Q.    Okay.  Can you give me an idea of what your

15   duties are as a patrol officer.

16   A.    Calls for service and, when time allows,

17   proactive law enforcement measures such as making

18   contact with suspicious people or consensual

19   encounters or traffic stops.

20   Q.    Do they give you guys take-home cars in the

21   City of Dunwoody?

22   A.    They do.

23   Q.    Who's your direct supervisor right now?

24   A.    My sergeant is Robert Parsons; my lieutenant

25   is Lieutenant David Barnes.

Officer Caleb Gilbert
12/31/2014

1      Q.    How about the captain above lieutenant?

2      A.    We actually don't have captains in Dunwoody

3   yet.  It goes from lieutenant to deputy chief.  Deputy

4   chief is David Sides, and he's the acting chief.

5      Q.    So the deputy chief is also the acting

6   chief?

7      A.    For the time being, yes, sir.

8      Q.    Okay.  How many lieutenants do you guys

9   have?

10     A.    Well, we have three, but one per -- we have

11  a administrative/detective lieutenant, we have a day

12  shift lieutenant and a night shift lieutenant.

13     Q.    And then how many sergeants under each

14  lieutenant?

15     A.    You have an A Team and a B Team.  It's

16  pretty self-explanatory that when we're not on, the

17  other shift is, which is B Team.  We're A Team.  So

18  you have one sergeant per team, A and B, and then you

19  have a swing sergeant.  Therefore, you have three

20  sergeants.

21     Q.    How many officers total do you guys have?

22     A.    Gosh, I would say approximately, officers

23  and detectives combined, maybe 75 to 80 officers.

24     Q.    When did you start working for City of

25  Dunwoody?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1        A.    June of 2012.

2        Q.    Since you have been hired with the City of

3    Dunwoody, have you been subject to any disciplinary

4    action by the department?

5        A.    No, sir.

6        Q.    Have you had any complaints filed against

7    you?

8        A.    Yes, sir.

9        Q.    Can you recall what the substance of those

10   complaints were?

11       A.    One was a courtesy complaint on the side of

12   the road, and the other was a courtesy complaint as

13   well.  Those are the ones that I know of, that I can

14   think of right off the top of my head.

15       Q.    Tell me what a courtesy complaint is.

16       A.    Courtesy complaint is just -- it can range

17   from the tone of your voice to actually what you say

18   on scene.

19       Q.    So the first of the two that you mentioned,

20   can you tell me what the substance of that complaint

21   was.

22       A.    One was a woman was asked and then she was

23   told to get off the phone, and then I got the cell

24   phone from her hand and hung it up for her during the

25   middle of an investigation.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1        Q.    Was that for a traffic stop?

2        A.    It was.

3        Q.    And how about the second complaint?

4        A.    The second one was a subject was being

5    frisked, and during the frisk, he jerked away from me,

6    and I used that much more force, you know, to hold on

7    to him.

8        Q.    Was he injured?

9        A.    No, sir.

10       Q.    Can you recall the approximate dates?  Did

11   these happen this year?

12       A.    The one with the cell phone did, and then

13   the one with the jerking away from me, pulling away

14   from me, happened in June of 2012.

15       Q.    Okay.  You guys have video recorders in your

16   patrol cars; correct?

17       A.    That's correct, sir.

18       Q.    And the way those work is that they

19   continuously record but overwrite what they're

20   recording until you activate your emergency lights; is

21   that --

22       A.    Yes, sir.

23       Q.    And at the point you activate your emergency

24   lights, it actually jumps back in time and saves the

25   portion of the video that had previously recorded; is

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1    that right?

2         A.   Yes, sir.

3         Q.   Okay.  Do you know how long it jumps back in

4    time?

5         A.   30 seconds.

6         Q.   Okay.  So let's just jump right into the

7    incident in question here, this lawsuit.

8         A.   Okay.

9         Q.   So for these question, the incident I'm

10   referring to, for the record, is the August 2, 2013,

11   arrest of Renee Schroeder.

12        A.   Yes, sir.

13        Q.   And you said that you reviewed your report

14   and the video, and you attended my client's

15   deposition, so you obviously have some recollection of

16   this event; right?

17        A.   Yes, sir.

18        Q.   Okay.  Can you tell me what initially

19   attracted your attention to the car in which my client

20   was riding.

21        A.   The reason it was stopped was for swerving

22   and failing to maintain lane.

23        Q.   Did you observe those violations?

24        A.   Yes, sir, I did.

25        Q.   Okay.  How long did you wait after you

Officer Caleb Gilbert
12/31/2014

1    observed those violations to initiate the stop?

2         A.    Probably a minute or two.

3         Q.    Why wait for a minute or two?

4         A.    Because I was stopped at a traffic light.

5    That's one thing.  And then looking for a safe

6    location to pull over.  Oftentimes, prior to pulling

7    over people, I often try my best to make sure that I'm

8    going to provide or we're in an area that's going to

9    provide them a safe location to pull over.

10        Q.    All right.  When you decided to initiate the

11   stop, take me through your procedure for that.  So

12   obviously you're going to call back in to Dispatch and

13   let them know that you're going to initiate a stop; is

14   that correct?

15        A.    That's correct, yes, sir.

16        Q.    Okay.  So would that be your first

17   communication about this car with anyone else?

18        A.    Yes, sir.

19        Q.    Okay.  What did you report back to Dispatch?

20        A.    That I was making a traffic stop, gave the

21   location, the tag that was displayed on the rear of

22   the vehicle, and then the description of the vehicle.

23        Q.    Did you run that tag through your GCIC

24   system or whatever system you guys have to pull up

25   ownership information?

Officer Caleb Gilbert
12/31/2014

1      A.   I don't recall.

2      Q.   Okay.  Is that something you typically do in

3   a traffic stop?

4      A.   I try to make it a habit, yes, sir.

5      Q.   And would you do that before you pulled the

6   car over or after?

7      A.   Before I pulled the car over.

8      Q.   Okay.  What information do you get back when

9   you type the license plate in?

10      A.   Whether or not the tag is valid and whether

11   or not they have actual current insurance status for

12   the vehicle.

13      Q.   Do you get -- obviously you get ownership

14   information as well?

15      A.   Registered owner, yes, sir, I do.  I get

16   that as well.

17      Q.   Okay.  Would it show if the owner has any

18   warrants out for them?

19      A.   No, sir.

20      Q.   Okay.

21      A.   Well, there have been instances where you do

22   run tags and the individual will come back with

23   warrants, but what prompts that, I have no idea.

24      Q.   Okay.  So is the only information you get:

25   The owner, the insurance, and the validity of the tag?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1      A.    Right.  I think there's some lienholder

2    stuff on there as well, which is irrelevant to our

3    duties.

4      Q.    Okay.  After you activated your emergency

5    lights, you noticed the rear passenger hand something

6    to the front seat passenger.  Is that fair to say?

7      A.    Yes, sir, it appeared so.

8      Q.    Okay.

9      A.    There was a lot of movement going on inside

10   the vehicle from what I could tell and from my angle.

11     Q.    Were you able to see inside the vehicle even

12   though it was nighttime?

13     A.    Yes, sir.  I mean, I can see silhouettes,

14   and I can see movement because I do have a spotlight

15   that's placed on the vehicle, and the area in which we

16   pulled over was, you know, somewhat lit compared to

17   other circumstances.

18     Q.    Could you see how many passengers were in

19   the car?

20     A.    Yes, sir, I saw three passengers.

21     Q.    Could you see whether they were male or

22   female?

23     A.    Uh-uh (negative).

24     Q.    Okay.  And when you say you saw an object,

25   is it possible for you to describe what you saw being

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1    passed?

2         A.   No, sir.

3         Q.   Is that because you don't remember it or

4    because you didn't have a clear view?

5         A.   Because I didn't have a clear view.

6         Q.   Okay.  You didn't observe anything being

7    thrown from the vehicle; correct?

8         A.   I did not.

9         Q.   Do you recall if you got the name of the

10   person who was the owner of the vehicle before you

11   exited your car?

12        A.   No, sir.

13        Q.   You don't recall?

14        A.   I don't recall.

15        Q.   Okay.  Now, after you initiated the stop,

16   Mr. Beazer, the driver, took a minute or two to

17   actually stop his car.  Does that indicate to you that

18   illegal activity may be afoot?

19        A.   Not in and of itself.  It's something that

20   adds to reasonable suspicion.

21        Q.   Okay.  Reasonable suspicion for?

22        A.   An officer.

23        Q.   Of the commission of a crime?

24        A.   No.  Kind of rephrase what you're saying

25   there.

Officer Caleb Gilbert
12/31/2014

1    Q.   Sure, sure.  Obviously, if you're pulling

2    the car over, you have reasonable suspicion they've

3    committed a traffic offense?

4    A.   Right, right.

5    Q.   So you don't need any further reasonable

6    suspicion, but when you see a car take a long time,

7    what additional illegal activity might you suspect in

8    addition to the traffic violation?

9    A.   It's a range of situations.  It depends on

10   the circumstances in which we are presented with at

11   the time.

12        Situations where you start seeing a lot of

13   movement, obviously officer safety issues are

14   paramount.  That's the first thing that you want to be

15   concerned with, making sure that, you know, they're

16   not plotting anything against you.

17        Or it could range all the way to illegal

18   activity, such as open container to drugs.  So I mean,

19   there's a lot of things that it could be, but is that

20   in and of itself something I'm going to say "drug

21   activity" or "guns"?  No.

22   Q.   Okay.

23   A.   It's something that would raise suspicion

24   for me.

25   Q.   Okay.  Now, are you a drug recognition

Officer Caleb Gilbert
12/31/2014

1    expert?

2         A.    I am.

3         Q.    Okay.  That obviously means you are trained

4    to give field sobriety evaluations as well; right?

5         A.    Yes, sir.

6         Q.    Okay.  Do you make -- well, let me ask it

7    this way:  In the last year, per week, could you

8    estimate how many arrests you've made, you know, on an

9    average week.

10        A.    Just general -- just arrest from Dispatch or

11   proactive arrest?  Do you want it to be proactive?

12   Kind of be a little bit more specific.

13        Q.    Sure, sure.  Let's do proactive arrests.

14        A.    Okay.  Proactive arrests, in the last year,

15   I would say in the neighborhood of 50 to 75.

16        Q.    Per week?

17        A.    Oh, not per week.

18        Q.    Okay.

19        A.    I would say one to two.

20        Q.    Okay.  How about if we include Dispatch

21   arrests?

22        A.    You might be able to bump that number up to

23   two to three maybe.

24        Q.    Okay.  When we say "Dispatch arrests," are

25   we talking about serving warrants mostly?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1      A.    Shoplifters.

2      Q.    Okay.  I imagine you guys get a lot of that

3  an Ashford Dunwoody?

4      A.    Oh, yeah.

5      Q.    All right.  So after you initiated the stop

6  and Mr. Beazer pulled the car over -- and he parked in

7  LA Fitness parking lot; right?

8      A.    Uh-huh (affirmative).

9      Q.    And then you approached his door.  And do

10 you recall what you said to him first at that point?

11     A.    My general practice is to identify myself as

12 a police officer and advise them the reason which they

13 were stopped.

14     Q.    Okay.  Then after that, do you recall asking

15 him whose car it was?

16     A.    No, sir, not at that point.

17     Q.    Okay.  Did you ask him that at some point?

18     A.    Not that I recall -- no.  At some point,

19 yes, I did.  I did towards the end of the

20 investigation.

21     Q.    Okay.  Do you recall asking for

22 identification from each of the passengers?

23     A.    Yes, sir.

24     Q.    Okay.  Why did you ask for ID from each of

25 the passengers for a routine traffic stop?

Officer Caleb Gilbert
12/31/2014

1     A.   I make that a common practice.

2     Q.   Have you ever had anyone refuse to give you

3  ID?

4     A.   Yes.

5     Q.   And how do you react in that situation?

6     A.   I don't go any further with it.

7     Q.   Is that because, absent some indication of

8  wrongdoing by a passenger, you don't have the

9  constitutional basis to demand identification?  Is

10  that your understanding?

11     A.   Rephrase that one more time, please.

12     Q.   Do you have the lawful authority to demand

13  that a passenger show you their ID?

14     A.   It would depend on certain situations, but

15  in the routine traffic stop -- if we can actually deem

16  things as routine in a traffic stop -- the average

17  traffic stop, no, sir.

18     Q.   Okay.  Tell me exactly what driving

19  violations you observed prior to initiating the stop.

20     A.   Failing to maintain lane, a vehicle drifting

21  out of its road of travel, swerving in its roadway as

22  well.

23     Q.   Swerving within its roadway?

24     A.   That's correct.

25     Q.   But you did actually observe it drifting out

Officer Caleb Gilbert
12/31/2014

1    of its lane?

2         A.    Yes, sir.

3         Q.    Did it touch one of the lane lines or --

4         A.    Yes, sir.

5         Q.    Okay.  Do you recall which side of the car?

6         A.    I don't.  It wasn't mentioned in my report.

7    I don't remember that.

8         Q.    Okay.  Why didn't you issue a citation for

9    failing to maintain lane?

10        A.    I just didn't.

11        Q.    So after you pull over the car, you exit,

12   you ask for identification, do you recall asking the

13   driver to exit the vehicle?

14        A.    I do.

15        Q.    What was the purpose in asking him to exit

16   the vehicle?

17        A.    At that point, I have a few things, a few

18   indicators that are starting to click in my head as

19   far as my training is concerned.

20              An individual, or a vehicle, I should say,

21   that takes an extended amount of time to pull over

22   with movement inside, not to mention when you have

23   three individuals that issue you three different state

24   IDs, those are all indicators that raise suspicion to

25   an officer.

Officer Caleb Gilbert
12/31/2014

1          Therefore I had him exit the vehicle, and I
2     began to speak with him separately to initiate an
3     investigation to where we can speak with individuals
4     and have a unbiased or a non-influenced response when
5     we're talking to him.
6          Q.   Did the driver appear nervous to you?
7          A.   Somewhat.
8          Q.   How did that nervousness manifest?
9          A.   As far as not making general eye contact
10    with me whenever I was speaking with him or, you know
11    -- that's it that I can recall at this time where that
12    was mentioned in my report.
13         Q.   At the time you had him exit the car, did
14    you have reason to suspect that he was driving under
15    the influence?
16         A.   No, sir.
17         Q.   And after he exited the car, your first
18    questions, I believe, related to whether the backseat
19    passenger handed something up to the front.  Do you
20    recall that?
21         A.   Yes, sir.
22         Q.   Okay.  At that point, your suspicions were
23    that they were carrying contraband?
24         A.   I had suspicions, yes, sir.
25         Q.   Okay.  And do you recall saying to him after

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1    he exited the car:  If there's anything inside the

2    vehicle, now would be the time to tell me?

3         A.   Yes, sir.

4         Q.   Okay.  Is that standard practice?

5         A.   Sometimes.

6         Q.   What would make that -- what would cause you

7    to make the decision to say that to a person you've

8    pulled over?

9         A.   Well, as far as just giving somebody the

10   opportunity, to test the waters and see how the

11   investigation is going to be conducted, you know, as

12   far as honesty is concerned.

13        Q.   Okay.  And he told you that there was

14   nothing inside the vehicle that he knew of?

15        A.   Right.  He stated, not that I'm aware of, I

16   believe, specifically.

17        Q.   Okay.

18        A.   Which is another indictor.  If you're

19   driving an automobile, you would assume that you would

20   know everything that's inside the vehicle.

21        Q.   Even if you're carrying two passengers?

22        A.   Yes, sir.  You would know the character of

23   the individuals, or you should know the character of

24   the individuals that you have riding with you.

25        Q.   And so at that point, you asked him for

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1    permission to search the vehicle?

2        A.    I did.

3        Q.    He gave it to you?

4        A.    He did.

5        Q.    Was your exact phrase:  Do I have permission

6    to search your vehicle?

7        A.    I don't know if it was my exact phrase.

8        Q.    Okay.  But is it fair to say that's an

9    accurate paraphrase of what you said?

10       A.    Yes, sir.

11       Q.    Okay.  And he responded and gave you

12   permission; right?

13       A.    He did.

14       Q.    Okay.  And then at some point, a number of

15   other officers arrived on the scene.  I believe there

16   were some officers from Sandy Springs; is that right?

17       A.    That's correct.

18       Q.    Do you know how they wound up coming to the

19   scene?

20       A.    They probably were monitoring our radio

21   system, but more specifically, I couldn't answer for

22   them.

23       Q.    Did you report back to Dispatch that you

24   were conducting a drug investigation?

25       A.    I did not.

Officer Caleb Gilbert
12/31/2014

1    Q.   Okay.  Is it fair to say that at that point

2    you were conducting a drug investigation?

3    A.   No, sir.

4    Q.   No.  Still a traffic investigation?

5    A.   It's an investigation to dispel any

6    suspicion that I have.

7    Q.   Did you have a partner with you in the car?

8    A.   No, I didn't.

9    Q.   Was there a second City of Dunwoody police

10   officer there?

11   A.   Yes, sir.

12   Q.   Who was he?

13   A.   Officer Cheek.

14   Q.   Is he still with Dunwoody?

15   A.   He is.

16   Q.   Anyone else from City of Dunwoody?

17   A.   Not that I recall.

18   Q.   All right.  And Officer Cheek arrived in a

19   separate patrol car?

20   A.   Yes, sir.

21   Q.   Okay.  Was he sent out by Dispatch?  Do you

22   know?

23   A.   Whenever I was pulling the vehicle over,

24   they asked if I wanted a additional unit, and I said

25   that that probably wouldn't be a bad idea, therefore

American Court Reporting Company, Inc.
404-892-1331

1    either he jumped it and said, I'll go, or they

2    dispatched him.

3         Q.   Okay.  Do you usually request an additional

4    unit for traffic stops?

5         A.   No, sir.

6         Q.   At what point did you report that it

7    wouldn't be a bad idea for another unit to arrive?

8         A.   As we were pulling into the parking lot,

9    where the final stop location was.

10        Q.   Okay.  And I don't mean to beat a dead horse

11   here, but can you just tell me what you saw at that

12   point that caused you to believe another unit wouldn't

13   be a bad idea.

14        A.   Well, when you see individuals -- when you

15   have three individuals inside of a vehicle that are

16   moving around, slow stop or slow gradual descent to,

17   you know, the stop location.

18        Q.   Okay.  At some point during your

19   investigation, you claimed that you smelled marijuana

20   coming from the car; correct?

21        A.   Yes, sir, that's correct.

22        Q.   Do you remember the point where you noticed

23   that odor?

24        A.   When I was on the passenger side of the

25   vehicle.

Officer Caleb Gilbert
12/31/2014

1      Q.   And this is obviously after one of the
2   passenger side doors was opened; right?
3      A.   Correct, yes, sir.
4      Q.   Do you recall which door was opened?
5      A.   I believe it was the rear passenger door.
6      Q.   Was this a smell of burned or unburned
7   marijuana?
8      A.   Raw marijuana, meaning unburnt.
9      Q.   Okay.  This may be difficult, but can you
10  describe for me the difference between those two
11  smells.
12     A.   Yeah.  One's burning and one's not.
13     Q.   Okay.  What about when it's already burned?
14     A.   When it's already burned, it smells like
15  burnt marijuana, and then you have marijuana.
16     Q.   And do we have three - is there burned,
17  burning, and raw?  Are those three distinct smells
18  that you can tell the difference between?
19     A.   One's burnt and one's raw.
20     Q.   Okay.  So what specifically tips you off
21  that it's one smell or the other?  Is there anything
22  you can articulate?
23     A.   One's burning and one's not.
24     Q.   Okay.  How were you trained to detect the
25  odor of marijuana?

Officer Caleb Gilbert
12/31/2014

1        A.    Through actual experience in the field and

2    then having a type -- I guess a controlled burn, if

3    you will, inside of a classroom.

4        Q.    Can you describe for me the conditions in

5    which a controlled burn occurred.

6        A.    They bring in marijuana and burn it in a

7    classroom.

8        Q.    Just in an open classroom?

9        A.    You know, just like a college classroom.

10   They bring it in the -- the teacher brings it in and

11   burns it.  If I recall correctly, they have it in like

12   -- they have it in like a metal, maybe ashtray or

13   something, and they burn it, and then they walk it

14   around the room.

15       Q.    Okay.  Is this while you were in the Police

16   Academy, or is this subsequent training?

17       A.    Subsequent training.

18       Q.    And was that part of the drug recognition

19   expert training or some other training?

20       A.    Drug ID or Drug Identification.

21       Q.    And is that just the general class that

22   everyone takes, or is that a specialized training?

23       A.    It's a specialized training.

24       Q.    Okay.  Do you guys receive any training how

25   to distinguish between marijuana and other plants or

Officer Caleb Gilbert
12/31/2014

1    materials that might smell like marijuana?

2         A.   They just bring in marijuana and we smell it

3    that way.

4         Q.   Do they give you a list of substances that

5    might smell like marijuana?

6         A.   No, sir.

7         Q.   Are you aware of any other plants that may

8    mimic the smell of marijuana?

9         A.   No, sir.

10        Q.   Is it your understanding that if you smell

11   marijuana in the car, that gives you probable cause to

12   search?

13        A.   Yes, sir.

14        Q.   So you smelled marijuana when the backseat

15   passenger door was opened, and at that point, you

16   asked the backseat passenger to exit the vehicle;

17   right?

18        A.   I believe that's the way that it worked out.

19        Q.   Okay.  And what was her reaction to you

20   saying that the vehicle smelled like marijuana?

21        A.   I don't recall.

22        Q.   Okay.  Did you look through the backseat

23   passenger's purse?

24        A.   I don't think she had one.

25        Q.   Okay.  Did you search her pockets?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1      A.   No, sir.

2      Q.   Okay.  After you spoke to the backseat

3   passenger, you went on to the front seat passenger,

4   which was Renee Schroeder; correct?

5      A.   Yes, sir, if memory serves me correctly.

6      Q.   And as she exited the vehicle, she attempted

7   to take her purse with her; right?

8      A.   If I remember correctly, yes, sir.

9      Q.   Okay.  And you told her that you would have

10   to look through her purse?

11      A.   I didn't say I had to.  I asked for consent

12   to search it.

13      Q.   Okay.  And did she consent to a search of

14   her purse?

15      A.   Yes, sir.

16      Q.   How did she do that?

17      A.   She handed me the purse.

18      Q.   When you took the purse, did you notice the

19   smell of marijuana coming out of her purse?

20      A.   Not that I recall.

21      Q.   Did you find any marijuana in her purse?

22      A.   No, sir.

23      Q.   Okay.  And as you continued to search the

24   vehicle, did you eventually find any marijuana?

25      A.   I did not.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1        Q.    Have you experienced that before, where you

2    smell marijuana, but you can't find it in the vehicle?

3        A.    Multiple times, yes, sir.

4        Q.    Is it a regular occurrence?

5        A.    It's not a regular occurrence.  It's over a

6    eight-year period of being in law enforcement or being

7    attached to some type of -- or being in some type of

8    capacity of law enforcement.  You know, it happens due

9    to, you know, a lot of circumstances.

10       Q.    Did you call Renee's husband at some point

11   during your investigation?

12       A.    I did.

13       Q.    Were you able to contact him?

14       A.    No, sir.

15       Q.    What cell phone did you use to call him?

16       A.    My work phone.

17       Q.    Could you give me that cell phone number.

18       A.    Yes, sir.  (678) 332-9956.

19       Q.    Did you leave a voice mail for him when you

20   called?

21       A.    I think so, but we'll just keep it as if my

22   memory serves me correctly, yes, sir.

23       Q.    Okay.  Do you recall what you said on the

24   voice mail?

25       A.    More than likely, it was, Officer Gilbert --

Officer Caleb Gilbert
12/31/2014

1    no, I don't recall specifically.

2         Q.    Okay.  Did you advise him that Renee, you

3    were placing Renee under arrest or --

4         A.    I don't recall.

5         Q.    Okay.  Did he ever call you back?

6         A.    No, sir, not that I'm aware of.

7         Q.    Okay.  Why did you call him?

8         A.    Well, you want to make sure that you have a

9    thorough investigation, but more importantly, not only

10   are you dealing with a violation of Georgia Controlled

11   Substances Act, you also might be dealing with a

12   theft.

13        Therefore, you want to make sure that if, in

14   the case that it's a theft, does the victim want to

15   prosecute, and it's a headache to find out three or

16   four days after the fact to, you know, re-accuse it,

17   go back and get, you know, additional charges,

18   especially if it's two felonies.

19        Therefore, you're going to have two first

20   appearances, and if she's bonded out in the process,

21   she's got to be picked back -- you know, a lot of --

22        Q.    Now, you don't really care if he wishes to

23   prosecute, do you?

24        A.    Yes, sir.

25        Q.    You do?

Officer Caleb Gilbert
12/31/2014

1       A.    Yes, sir, that's my job.

2       Q.    So if a victim of a crime says, I don't want

3   to prosecute, will you back off?  I understand this is

4   a generalized question so --

5       A.    Well, it depends on what type of

6   investigation we're talking about.  Domestic violence

7   laws, we have to.  The code section says that we shall

8   make an arrest in those instances because we're the

9   prosecutor.

10           However, in situations where two individuals

11  are fighting in public, and whoever is the primary

12  aggressor and whoever is the victim, and the victim is

13  like, no, I don't want to prosecute, I'm not going to

14  waste my time, let alone I'm not going to waste the

15  Court's time.

16      Q.    So if Bill Schroeder had said he didn't want

17  to prosecute, would you not have arrested?

18      A.    No.  She would have been arrested.  She was

19  already arrested due to the fact that she was in

20  possession of a controlled substance here in the

21  state.

22      Q.    Was she in handcuffs at the time you placed

23  that phone call?

24      A.    I don't recall.

25      Q.    Okay.  Ever have any communication with Bill

1    Schroeder, or William Schroeder?

2        A.   Not that I recall.

3            MR. FILIPOVITS:  Okay.  Tell you what,

4        I'm jumping around here so much, why don't we

5        take five minutes and let me go through, gather

6        everything together, and we'll keep going.  All

7        right?

8            THE WITNESS:  All right.

9            MR. FILIPOVITS:  All right.  We're off

10       the record.

11           (Recess taken.)

12           MR. FILIPOVITS:  Back on the record.

13   BY MR. FILIPOVITS:

14       Q.   You said that Ms. Schroeder, at the point

15   you called Mr. Schroeder, that Renee was under arrest

16   for violation of the Georgia Controlled Substances

17   Act; right?

18           MS. COWAN:  Object to the form.  I just

19       want to make sure that that was the statement

20       that was made.

21           THE WITNESS:  Well, I didn't make that

22       statement.  I said that I don't recall what I

23       said on the conversation.

24   BY MR. FILIPOVITS:

25       Q.   I'm sorry.  Maybe I asked improperly.  We'll

Officer Caleb Gilbert
12/31/2014

1    just start all over again.

2        A.    Okay.

3        Q.    All right.  Could you tell me the facts that

4    you relied upon when you decided that Ms. Schroeder

5    had violated the Georgia Controlled Substances Act.

6        A.    Well, in and of itself, being in possession

7    of any controlled substance is a violation of state

8    law if you're not prescribed that medication or if

9    you're not supposed to have that type of drug.

10        Whenever you consider other circumstances,

11    such as the slow descent of the vehicle.  Whenever you

12    make contact with the driver, you have him step out,

13    you ask him how he knows the individual in the front

14    or what his relationship to him were, and he states

15    that they're girlfriend/boyfriend.

16        You talk to her.  She's not

17    girlfriend/boyfriend at the beginning, and then I

18    confront her -- or not confront her, but I have her

19    clarify her statements, and she ultimately states,

20    yeah, we're boyfriend/girlfriend, which, you know,

21    indicates some type of deception going on with her

22    part.

23        Not to mention the odor of marijuana, and

24    then, whenever you get a pill bottle out that's dated

25    in 2010, if my memory serves me correctly, it's in a

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

```
 1      location in Pennsylvania.  The husband -- or excuse

 2      me.  The soon to be ex-husband is in North Carolina,

 3      and she's in the process of divorcing the individual,

 4      who she hasn't seen in over three or four months, and

 5      she's in possession of these pills.

 6              Not to mention my training also is very

 7      specific in the fact that prescription drugs are

 8      listed as, you know, in the top five overdose or

 9      drug-related deaths in the nation nowadays.

10              Where earlier we were dealing with issues of

11      methamphetamine-related deaths or cocaine-related

12      deaths, now we've started seeing deaths related to

13      antidepressants, CNS stimulants and so forth.

14              And then, like I say, as far as the fact

15      that you have a pill bottle that specifically states

16      that you cannot transfer this pill bottle to another

17      individual, that, in and of itself, the federal ledger

18      of that being on a pill bottle, she's in violation of

19      the Georgia Controlled Substances Act.

20          Q.   So anyone who possesses another person's

21      prescription medication is in violation of the Georgia

22      Controlled Substances Act?

23          A.   Yes, sir.

24          Q.   Even if those pills are in the original pill

25      bottle?
```

American Court Reporting Company, Inc.
404-892-1331

1        A.    That's absolutely correct, sir.

2        Q.    So for example, last night --

3             You can object to the form of this, but I

4    just want to understand.

5             Last night I picked up some prescriptions

6    for my neighbor, who's just out of the hospital.  I

7    had a number of them in my car.  The pharmacy

8    dispensed them to me.  Was I in violation of the

9    Georgia Controlled Substances Act?

10       A.    Technically, yes, sir.

11       Q.    Was the pharmacist who dispensed that

12   medication to me in violation of the Act?

13       A.    I don't -- I can't speak for a pharmacist.

14   I can only speak based on what I was trained and

15   experience.

16       Q.    Wouldn't he be aiding and abetting me in

17   violating the Georgia Controlled Substances Act?

18       A.    I can't answer that.

19       Q.    Should I have just let my neighbor die next

20   door?

21             MS. COWAN:  Object to the form.

22   BY MR. FILIPOVITS:

23       Q.    Would you help me get his medication if he

24   needed it?  What's a person supposed to do if they

25   can't leave their house?

1          A.   That's their issue, between them and their

2     doctor.  But we're not dealing with a life-and-death

3     situation here.  We're dealing with a Schedule IV drug

4     that she's in possession of that she can't be in

5     possession of based on not only state law, but federal

6     law.

7          Q.   Are you familiar with the Code of Federal

8     Regulations?  Do you know what that is?

9          A.   Not specifically.

10         Q.   Okay.  I'm going to hand you Plaintiff's

11    Exhibit 1.

12              Here, I've got a copy for you.

13              MS. COWAN:  Okay, great.

14              (Plaintiff's Exhibit No. 1 was marked for

15         identification.)

16    BY MR. FILIPOVITS:

17         Q.   This is just a printout of a subsection, and

18    if you skip down to that last sentence, you'll see it

19    says:  A covered entity may use professional judgment

20    and its experience with common practice to make

21    reasonable inferences of the individual's best

22    interest in allowing a person to act on behalf of the

23    individual to pick up filled prescriptions.

24         A.   Uh-huh (affirmative).

25         Q.   Do you see that?

1        A.    Uh-huh (affirmative).

2        Q.    Okay.  So if the Code of Federal Regulations

3    permits pharmacists to exercise their judgment in

4    dispensing medication to people acting on behalf of

5    the prescribed individual, how is that consistent with

6    your understanding of the law?

7              MS. COWAN:  I'll just object on the

8         basis that this is a code section that doesn't

9         necessarily have any context, and he's not an

10        attorney.  I think he can answer your questions,

11        but I'm objecting to the form of the question.

12              MR. FILIPOVITS:  That's fine.

13              MS. COWAN:  And to the relevance

14        because I don't think this code section is

15        relevant to this particular issue.

16              MR. FILIPOVITS:  That's fine.

17              MS. COWAN:  You can go ahead and

18        answer.

19            You may need to restate.

20    BY MR. FILIPOVITS:

21        Q.    I'm just trying to square my understanding

22    and experience with your --

23        A.    Okay.

24        Q.    -- interpretation of the law.

25        A.    Well, there's actually two ways in which I

Officer Caleb Gilbert
12/31/2014

1    want to answer this.

2         Q.   Okay.

3         A.   First, as far as the pharmacist is

4    concerned, in their dispensing those products,

5    16-13-75 actually has -- it references other code

6    sections and gives them the right to do so.  It does

7    not give spousal privileges.

8              As far as this is concerned, it mentions --

9    if you isolate a sentence, sure, but if you actually

10   look at it in its totality, it says:  Individual in

11   capacity or emergency circumstances.

12             There was no emergency circumstances for her

13   to be in possession of a pill, but that's even more

14   irrelevant because the fact is this:  She's in

15   possession of a controlled substance here in the state

16   of Georgia, and that's the reason in which she was

17   taken into custody.

18        Q.   What about minors?

19        A.   As far as what?

20        Q.   Is a parent in violation of the Georgia

21   Controlled Substances Act if they control their

22   child's prescription?

23        A.   Once again, that's out of the -- I mean,

24   that's out of the scope of this conversation because

25   this isn't a minor.  This is a soon to be estranged --

Officer Caleb Gilbert
12/31/2014

1    this is soon to be an ex-husband that lives two states

2    away that has a prescription bottle from 2010.

3              Not to mention, you know, whenever you have

4    situations where individuals acquire elicit drugs and

5    put them in old pill bottles to try to fool or try to

6    conceal their illegal activity.  You have a lot of

7    stuff going on here.

8              You know, you're not just looking at the

9    fact of somebody being in possession of it and them

10   being in the car with them or them being en route to

11   that person.  She's not even en route to this person

12   to give him pills.  So those things considered.

13        Q.   Okay.  Well, I'll just take this as my

14   opportunity to interview a police officer so that I

15   can determine if I am in violation of the law.  If

16   it's irrelevant, then we're never going to say this in

17   court.

18        A.   Okay.

19        Q.   All right?  So I have two elderly parents.

20   If I pick up their prescriptions, your opinion is that

21   I should be arrested?

22        A.   You're in violation of the law.

23        Q.   Okay.

24        A.   But you're not in possession -- you're not

25   telling me what type of prescription you're in

Officer Caleb Gilbert
12/31/2014

1  possession of.  What type of prescription are you in

2  possession of?

3          Even though that's kind of irrelevant, the

4  fact is this:  You have an individual that is two

5  states away from a soon to be ex-husband that's with a

6  new boyfriend.  Those facts considered go into the

7  arrest.

8          It's just not, hey, I'm going to pick up my

9  spouse's medicine, I'm going straight home, and it's

10  staying inside of a bag, and the count is going to be

11  60 whenever I get the pills and 60 whenever I get

12  home.

13     Q.   Okay.  So did you have evidence that she was

14  taking that prescription medication?

15     A.   No, sir, I didn't.

16     Q.   Or that she was dispensing it to anyone

17  else?

18     A.   Right. I did not.

19     Q.   Okay.

20     A.   But once again, she's taken into custody

21  with reference to possession.  She's not being taken

22  into custody for dispensing or selling these drugs.

23     Q.   Okay.  You didn't read my client or inform

24  her of her Miranda rights at any point during her

25  arrest, did you?

1        A.   It wasn't necessary.

2        Q.   Is that because you did not engage in any

3   interrogation?

4        A.   After her being told she was in custody,

5   that's correct.

6        Q.   Okay.  You did have an extended conversation

7   with her in the car; correct?

8        A.   But those are irrelevant to the facts and

9   circumstances surrounding the case.  It's now, you

10   know -- you know, as well as I do, I don't have to,

11   you know, read them a Miranda whenever I'm talking

12   about where they're from and all that kind of stuff.

13        Q.   What's a 54?

14        A.   A suspicious person or a suspicious

15   activity.

16        Q.   Where does that code come from?

17        A.   It was our code and signals in Cobb, and

18   various agencies have the similar ones.

19        Q.   And that's different than the 10 codes;

20   right?

21        A.   Yes, sir.

22        Q.   Okay.  How many codes are there?

23        A.   Hundreds.

24        Q.   Is there a list, a written list?

25        A.   Well, it just depends.  Some agencies have

1    different 10 codes.  You have 10 codes, and you have

2    signals.  Some agencies use just codes, where others

3    use just signals.

4           Q.   Okay.  Does the City of Dunwoody have a list

5    of the codes that they use?

6           A.   They do.

7           Q.   Do you know what that list is called?

8           A.   I don't.

9           Q.   How would you refer to that document?

10          A.   Codes and signals.

11          Q.   You recall attending my client's deposition;

12   right?

13          A.   I do, yes, sir.

14          Q.   Okay.  Do you recall the point in which she

15   was in the bathroom, making sounds as if she was

16   vomiting?

17          A.   I do.

18          Q.   Okay.  And do you recall me saying to you

19   that your presence made her very anxious?

20          A.   Yes, sir.

21          Q.   Okay.  Do you recall smiling at me when I

22   said that?

23          A.   No, sir.

24                 MS. COWAN:  Objection.

25   BY MR. FILIPOVITS:

1        Q.   Was it your intent to intimidate my client

2    by coming to the deposition?

3        A.   No, sir, not at all.

4             MS. COWAN:  I'm sorry.  He has a right

5        to be at the deposition in this case.  He's a

6        party to the case, so he was there to be

7        informed.

8             MR. FILIPOVITS:  Sure, that's fine.  He

9        can answer it.  He's certainly entitled to it.

10        That's why I didn't object to you being

11        there.

12   BY MR. FILIPOVITS:

13        Q.   Were you aware that my client attempted to

14   have the deposition conducted via video conference?

15        A.   Yes, sir.

16        Q.   Okay.  Have you seen the judge's order in

17   this case, denying your motion for judgment on the

18   pleadings?

19        A.   No, I haven't.

20        Q.   Okay.  After my client's deposition, you

21   remained parked in your patrol car in our parking lot

22   for a period of time?

23        A.   Uh-huh (affirmative).

24        Q.   Can you tell me what you were doing at that

25   point.

Officer Caleb Gilbert
12/31/2014

1      A.    I was contacting my supervisor, wanting to

2    know whether or not they wanted me to come in to work

3    or not come in to work and so forth, answering e-mails

4    that I missed.

5              MS. COWAN:   As I recall, he and I had a

6         pretty lengthy conversation in the parking lot as

7         well.

8    BY MR. FILIPOVITS:

9         Q.    Did you go back to work then?

10        A.    I did.

11        Q.    And then you actually didn't pull out until

12   I pulled out with my client and her mother.   Do you

13   remember that?

14        A.    No, sir.

15        Q.    No?   Do you remember me driving behind you?

16        A.    No, sir.

17        Q.    No?

18             MS. COWAN:   He didn't pull out until I

19        pulled out.   We both left about the same time.   I

20        know we're kind of making a relevant issue about

21        that.

22             MR. FILIPOVITS:   We can put you under

23        oath if you want to testify.

24             MS. COWAN:   Okay.

25   BY MR. FILIPOVITS:

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1       Q.    All right.  Let's go through some of these

2    documents.  I'm not going to ask you a lot of

3    questions.  I just want to make sure I understand what

4    all of them are.

5       A.    Okay.

6             (Plaintiff's Exhibit No. 2 was marked for

7       identification.)

8    BY MR. FILIPOVITS:

9       Q.    Okay.  I'm going to give you Plaintiff's

10   Exhibit 2.  Can you identify this document for me.

11   It's three pages.

12      A.    Communications Event Report.

13      Q.    Okay.  And this is the Event Report

14   generated following your stop, the stop at issue in

15   this case; correct?

16      A.    Okay.

17      Q.    Just help elucidate for me some of the

18   information contained here.

19      A.    Okay.

20      Q.    In the Radio Log --

21      A.    Can I ask you a real quick question about

22   this?

23      Q.    Sure.

24      A.    I cannot specifically identify this is the

25   type of document that's issued.  I don't know where

Officer Caleb Gilbert
12/31/2014

1    this document came from, whether or not you typed it

2    up yourself or whether or not you got it from our

3    Dispatch.

4        Q.   Sure.

5        A.   So I don't know if that's relevant.

6        Q.   Well, that's fine.  But let's -- does this

7    look like an Event Report typically generated by your

8    department?

9        A.   That's what I'm -- I've never seen one of

10   these.

11       Q.   You don't see these?

12       A.   No, sir.

13       Q.   Okay.  So let's -- if you can, and if you

14   can't answer this, that's fine.

15       A.   Okay.

16       Q.   Let's go down to the Radio Log.  That first

17   line, it looks like there's a unit number, which I

18   assume should be 3232.  Was 3232 your unit number?

19       A.   Where do you see that?  Can you point to it.

20       Q.   Under Radio Log in the lower quarter of the

21   page.

22       A.   Yeah.  It's kind of cut off on one side.  I

23   see what you're talking about, though.

24       Q.   Okay.  Description, it says Dispatched, and

25   then there's a Time Stamp, and it says User, M.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

 1    Childers; right?

 2         A.   Uh-huh (affirmative).

 3         Q.   If you can answer this, is that an entry

 4    that M. Childers would have made following your report

 5    to Dispatch?

 6         A.   Like I say, I can't answer that.

 7         Q.   Okay.  How about -- go over to the second

 8    page, Event Log.  Have you ever seen an Event Log like

 9    this before?

10         A.   I have not.

11         Q.   Okay.  We'll move on to the next one.

12              (Plaintiff's Exhibit No. 3 was marked for

13              identification.)

14    BY MR. FILIPOVITS:

15         Q.   This is a nine-page document.  If you could

16    skip ahead to page 8 of 9.  Have you seen this type of

17    document before?  After you get a chance to look at

18    it.

19         A.   No, sir.

20         Q.   Okay.  On that top row of information, it

21    looks like it says Agency, Prime on the heading, the

22    fourth column from the right.

23         A.   Okay.  I'm there.

24         Q.   Okay.  And then it says DPD?

25         A.   Uh-huh (affirmative).

Officer Caleb Gilbert
12/31/2014

1      Q.   Do you have any idea what that means?

2      A.   I would assume that it means Dunwoody Police

3  Department.

4      Q.   Okay.  And then underneath that, 3232,

5  that's your unit number; correct?

6      A.   I believe that was my unit number for that

7  night.

8      Q.   Okay.  So assuming that this document wasn't

9  typed up by me in some attempt to trick everyone --

10     A.   Oh, no, no, no.  I wasn't trying to suggest

11  that.  I just don't know.

12     Q.   No, I understand.  But assuming this

13  document is otherwise, you know, authenticated, does

14  this appear to reflect notes from your traffic stop of

15  the car in which my client was traveling?

16     A.   I don't recall.  I don't ever look at the

17  notes that Dispatch puts in the call unless it's

18  related to a Dispatch call.

19     Q.   Okay.  Do you have any idea what that prefix

20  LAW means in front of some of the notes?

21     A.   Prefix LAW.

22     Q.   It's in braces or in brackets.

23     A.   Yeah.  I have no idea.

24     Q.   Brackets, I mean.  Okay.  Do you see where

25  it says, on the third line of the notes, where there's

Officer Caleb Gilbert
12/31/2014

1    a brace, and it says IN220, another brace?

2         A.    I have no idea.

3         Q.    No idea what that means?

4         A.    No, sir.

5         Q.    Okay.  All right.  We're flying through

6    this.  Let's go on to the next one.

7              (Plaintiff's Exhibit No. 4 was marked for

8         identification.)

9    BY MR. FILIPOVITS:

10        Q.    All right.  On Exhibit 4, take a look at

11   that, and let me know when you've had a chance to look

12   it over.  My only question is whether this is the

13   police report you generated following my client's

14   arrest.

15        A.    Yes, sir, it looks to be my police report --

16        Q.    Okay.

17        A.    -- referencing this issue.

18        Q.    That's all I've got on that one.

19        A.    Okay.

20             (Plaintiff's Exhibit No. 5 was marked for

21        identification.)

22             (Court reporter interruption.)

23   BY MR. FILIPOVITS:

24        Q.    Okay.  We're up to Exhibit 5.  Does the area

25   in this map shown on Exhibit 5, does this reflect the

Officer Caleb Gilbert
12/31/2014

1    area in which the traffic stop was conducted?

2         A.   Yes, sir, to the best of my knowledge.

3         Q.   Okay.  Does it appear to be a fair and

4    accurate reflection of that area?

5         A.   It appears so.

6         Q.   Okay.  And the LA Fitness that we see there

7    toward the upper left quadrant, is that the LA Fitness

8    parking lot where my client was stopped?

9         A.   Yes, sir.

10        Q.   Okay.  Can you identify on that map where

11   you observed the traffic violation prior to the stop

12   of the car?

13        A.   If my memory serves me correctly, the

14   violation is right there.

15        Q.   Okay.  Would you mind circling that on the

16   map?

17        A.   Yeah.  Like I say, to the best of my

18   knowledge and the way my report is.

19        Q.   Sure, sure.

20        A.   I mean, I can't specifically, from an aerial

21   view map (makes marking).

22        Q.   That's fair.  And do you recall, to the best

23   of your recollection, where you turned on your blue

24   lights?  Would it be possible to mark that on the map?

25        A.   No, sir.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

```
 1        Q.    Okay.  When Mr. Beazer turned into the LA
 2    Fitness parking lot, did he turn in there from
 3    Perimeter Center West, or was that from Mount Vernon
 4    Highway?
 5        A.    I believe it was Mount Vernon Highway.
 6        Q.    Okay.  So he drove past the Tilted Kilt; is
 7    that correct?
 8        A.    Yes, sir, I believe so.
 9        Q.    Okay.
10            (Plaintiff's Exhibit No. 6 was marked for
11            identification.)
12    BY MR. FILIPOVITS:
13        Q.    All right.  You've got in front of you there
14    Exhibit 6.  Does that appear to be an accurate copy of
15    the arrest warrant that you sought for my client?
16        A.    Yes, sir.
17        Q.    Okay.  That's all I've got on that one.
18            (Plaintiff's Exhibit No. 7 was marked for
19            identification.)
20    BY MR. FILIPOVITS:
21        Q.    All right.  There's Exhibit 7.  Have you
22    seen this document before?
23        A.    No, sir.
24        Q.    You haven't?
25        A.    No, sir.
```

Officer Caleb Gilbert
12/31/2014

1      Q.   So you did not enter these notes?

2      A.   I may have entered these notes, but I

3  haven't seen this particular document.

4      Q.   Okay.  Have you seen a document like this

5  previously?

6      A.   No, sir.

7           (Plaintiff's Exhibit No. 8 was marked for

8      identification.)

9  BY MR. FILIPOVITS:

10     Q.   All right.  I'm going to show you Exhibit 8.

11     A.   Okay.

12           MR. FILIPOVITS:  This is our request

13     for production.

14           MS. COWAN:  All right.

15  BY MR. FILIPOVITS:

16     Q.   Have you seen this document before?

17     A.   Which document?  There's multiple.

18     Q.   The entire package.

19     A.   I haven't seen the entire package, no.

20     Q.   Okay.  Well, just do me a favor.  Skip to

21  the back of it, the end of it.

22     A.   The last page?

23     Q.   The last page.

24     A.   I'm there.

25     Q.   You see there's a Risk Management Policy.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

 1    I'm not interested in that.

 2         A.   Okay.

 3         Q.   Okay.  And then, just in front of the Risk

 4    Management Policy is that same document, Exhibit 7,

 5    that I showed to you.

 6         A.   Okay.  Yes, sir.

 7         Q.   Okay.  The reason I'm showing it to you in

 8    this context -- and if you look ahead of that

 9    document, I think you'll see a copy of your report.

10         A.   Okay.

11         Q.   And I'm just trying to put this into some

12    context.  This is how I got it.  It was through your

13    document production.

14         A.   Okay.

15         Q.   I'm just trying to figure out what exactly

16    this is, how it was generated, and who views it.

17         A.   Okay.

18         Q.   Does seeing it in this context maybe trigger

19    a memory at all?

20         A.   To be honest with you, I've kind of lost

21    track of what page you want me to be on.

22              MS. COWAN:  This, in that packet.

23              THE WITNESS:  Yeah.

24    BY MR. FILIPOVITS:

25         Q.   I'm just showing you that it was in this

Officer Caleb Gilbert
12/31/2014

1    packet.

2         A.    Yeah, yeah, yeah.  I've seen it.

3         Q.    So do you have any idea what Exhibit 7 shows

4    or how it was generated?

5         A.    Yes.  It shows her name, date of birth,

6    arrest, alerts, and incidents.

7         Q.    Okay.  So on the alerts, are these notes

8    that you guys keep on citizens you encounter?

9         A.    Yes, sir.  We have an RMS System.  Is that

10   what you're --

11        Q.    Maybe tell me what an RMS System is.

12        A.    I don't know what the acronym stands for but

13   it's basically our system in which we do all our

14   report writing and all of our GCIC/NCIC inquiries.

15        Q.    Okay.

16        A.    And where we get reports from.

17        Q.    Okay.

18        A.    Actually, you know what?  I misspoke.  We

19   actually do that on OSSI, which is -- this is not -- I

20   don't think this is RMS related.

21        Q.    Okay.

22        A.    Maybe, maybe not.  But as far as I know.

23        Q.    Have you seen a document like this on other

24   people where it shows alerts, arrests, prior

25   incidents?

Officer Caleb Gilbert
12/31/2014

1        A.    Right.  Maybe I'm getting confused of you

2    referencing this document because this specific

3    document I have not seen.

4        Q.    Right.

5        A.    The contents therein as far as what is her

6    name, date of birth, and all that kind of stuff, yes,

7    I have seen that.  I haven't seen that particular

8    document.

9        Q.    Okay.  Do you have any idea how somebody

10   would access this information?

11       A.    I know whenever we run an individual and if

12   we've had prior contact with them, it will show that

13   prior contact in our system.

14       Q.    Okay.

15       A.    I don't think everybody is in on that

16   system, but I couldn't speak on that, sir.

17       Q.    Okay.  So you guys do create a log of

18   individuals you encounter?

19       A.    Oh, yes, sir, absolutely.

20       Q.    And that log is separate from GCIC, for

21   example?

22       A.    Yes, sir, that is correct.

23       Q.    Okay.  And is it policy to create a log for

24   each person you encounter or each person you arrest?

25       A.    Well, when you arrest them or any type of

American Court Reporting Company, Inc.
404-892-1331

1   report that you do, it's going to link back to, I

2   guess, an RMS inquiry, if I'm stating it correctly.

3        Q.   Okay.  And so if another officer, say,

4   arrested Ms. Schroeder again, would they then add to

5   this information contained here already on Exhibit 7?

6        A.   I don't know if they would add to it.  It

7   would just depend on those circumstances.

8        Q.   Okay.

9        A.   I mean, if she's updated her address, yes.

10            MR. FILIPOVITS:  Okay.  I'm going to

11       take five more.

12            MS. COWAN:  Okay.

13       (Pause in proceedings.)

14            MR. FILIPOVITS:  Back on the record.

15   BY MR. FILIPOVITS:

16        Q.   After you placed my client in handcuffs, put

17   her in the back of the patrol car and transported her

18   to jail, you took her to the DeKalb County Jail;

19   correct?

20        A.   Yes, sir.

21        Q.   Does the City of Dunwoody have a jail?

22        A.   No, sir.

23        Q.   Okay.  So you take everyone you arrest to

24   DeKalb?

25        A.   Yes, sir.

Officer Caleb Gilbert
12/31/2014

1     Q.   Now, at the jail, you were aware that she

2   would be strip-searched; is that true?

3     A.   Yes, sir.  Not strip-searched.

4     Q.   Okay.

5     A.   Just regular search.

6     Q.   You knew she would at least be spending the

7   evening in jail; right?

8     A.   Yes, sir.

9     Q.   Until the following morning?

10     A.   Yes, sir.  Or until the first appearance --

11   not first appearance.  Whatever the --

12     Q.   Preliminary?

13     A.   Preliminary hearing.

14     Q.   Okay.  So at least until the next day, but

15   the preliminary hearing doesn't have to be for 48

16   hours following arrest.  Is that your understanding?

17     A.   Yes, sir.  It's actually first appearance.

18   That's what I was trying to think of.

19     Q.   Sure.  There are a number of names for it, I

20   think.  And after you took her to the jail, you sought

21   a warrant for her arrest; correct?

22     A.   Yes, sir.  I don't know if it was at that

23   particular moment because they shut down at 12:00.  I

24   don't know what time frame it was.  It may have been

25   the next day that I obtained a warrant.

Officer Caleb Gilbert
12/31/2014

Page 63

1      Q.    Okay.  And then, at the first appearance
2  hearing, were you present at the hearing?
3      A.    I was, sir.
4      Q.    Okay.  Why were you present?  Did the judge
5  take any evidence at the hearing?
6      A.    No, sir.  They make us go to the first
7  appearance if at all possible.  Now, if there are
8  conflicts such as we made an arrest -- like that was a
9  weekend, for example.
10         We arrest somebody on Sunday night, we're
11  able to obtain the warrant, but we can't make it to
12  the first appearance because they stop having them at
13  like 10:00 or 10:30, well, in those cases we would
14  have another officer do it the next day for us.  But
15  if we're able to go, we're made to go.
16      Q.    Do you know the purpose behind making you
17  go?
18      A.    No, sir, I didn't find that out.  They just
19  make us go.  I think it has something to do as far as
20  like the jail not -- because, as far as other
21  experiences that I had, the deputies handled that.
22  Officers don't.  I think we're actually, as far as
23  Metro Atlanta area, we're the only ones that do this.
24      Q.    Obviously there was no need for a probable
25  cause hearing because you had gotten a warrant;

Officer Caleb Gilbert
12/31/2014

1    correct?

2         A.   Yes, sir.

3         Q.   Okay.  So did you speak with the judge at

4    the bond hearing?

5         A.   I did.

6         Q.   Okay.  Well, tell me what you remember of

7    the bond hearing.  After her case is called, she

8    appears, tell me what you remember happening next.

9         A.   They read the charge, they formally read the

10   charges, and then they asked me criminal history, and

11   they asked me if I had any recommendations for the

12   Court.

13        Q.   Okay.  And did you have any recommendations?

14        A.   Yes, sir.  I believe I stood up and said

15   that she was very cooperative, which is standard

16   procedure for me.  Whenever I -- you know, I don't

17   take this stuff personally.  Just enforcing the laws.

18             Whenever I bring an individual in there, I

19   often tell the judge signature bond, but I leave it to

20   the Court's discretion because I don't want to be

21   disrespectful to the judge or be perceived as being

22   disrespectful.

23        Q.   Do you find that judges usually follow your

24   recommendation?

25        A.   For the most part.

Officer Caleb Gilbert
12/31/2014

1      Q.    Did you say anything else at the first

2   appearance?

3      A.    Not that I recall.

4      Q.    Okay.  Did you have other people you

5   arrested who were at that first appearance, or was

6   this client the only one you --

7      A.    I think she was the only one.

8      Q.    Okay.  Did you communicate with anyone in

9   the DeKalb County District Attorney's Office about

10  this case?

11     A.    No, I didn't.

12     Q.    Are you aware that her charges were dropped?

13     A.    I'm aware the charges were dropped, but

14  that's -- you know, that can happen any time due to

15  judicial economy or, you know, a number of

16  circumstances.

17     Q.    Did you receive any training on the

18  requirements of the Fourth Amendment in the context of

19  traffic stops?

20     A.    Can you be a little bit more specific with

21  your question.

22     Q.    Sure.  Are you familiar with the notion, the

23  legal doctrine, if you will, of expanding,

24  impermissibly expanding the scope of a traffic stop?

25     A.    I'm aware of expanding the scope of a stop.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1    Q.   Okay.  Have you received training or

2  education on the requirements of the Fourth Amendment

3  in that context?

4    A.   In certain aspects, yes, sir.

5    Q.   Tell me what kind of training you received.

6    A.   Basically it's described that a reasonable

7  amount of time to be able to conduct an investigation,

8  referencing the reasonable excuse stopping an

9  individual.  You know, things can expand that scope;

10  therefore, your time frame can expand until those

11  investigations are wrapped up or completed.

12    Q.   Okay.  Do you guys have drug dogs in your

13  department?

14    A.   No, sir.

15    Q.   So if you called a drug dog, would you call

16  the county?

17    A.   It varies.  It could be the county, Johns

18  Creek, Sandy Springs.  Those are the ones that I'm

19  used to requesting.

20    Q.   Okay.  Could you tell me -- we were talking

21  about your supervising staff earlier.  Let's see.  I

22  think you said three lieutenants; is that right?

23    A.   Yes, sir.

24    Q.   Could you tell me their race and gender.

25    A.   White male.

Officer Caleb Gilbert
12/31/2014

Page 67

1        Q.   All three?

2        A.   Yes, sir.

3        Q.   Okay.  And the deputy chief/acting chief,

4    also white male?

5        A.   Yes, sir,

6        Q.   How about the sergeants below them?

7        A.   Hispanic male, a black male, a white male,

8    and I think -- gosh, I guess two other white males, if

9    my numbers are correct.

10       Q.   Okay.  That brings us to five sergeants.

11       A.   Okay.  Then you have two additional white.

12   So you've got three, three, so it should be seven

13   total, so the additional would be white male as well.

14       Q.   Okay.  So it sounds like five white males,

15   one black male, and one Hispanic male?

16       A.   Yes, sir.

17       Q.   Okay.  All right.  Is there any rank between

18   -- does it go patrol officer, then master patrol

19   officer, then sergeant?

20       A.   We don't have master patrol officer.

21       Q.   Okay.  So you just go patrol officer, and

22   then the next rank is sergeant?

23       A.   Yes, sir.

24       Q.   Is there any rank below patrol officer?

25       A.   No, sir.

Officer Caleb Gilbert
12/31/2014

1        Q.    So of the, say, 80 or so employees -- well,

2    let's not count employees.  Is it fair to say about 80

3    officers in the department?

4        A.    Yes, sir, I would say.  And by "officers,"

5    I'm including detectives in that as well.

6        Q.    Sure, okay.  So of those 80, we've got seven

7    sergeants, three lieutenants, one chief.  So would it

8    be fair to say 69, about, patrol officers?

9        A.    I don't know if it's that high.

10       Q.    Okay.

11       A.    I would say, as far as patrol officers are

12   concerned, I think we try to staff -- gosh, these are

13   staffing issues.  I have no idea.

14       Q.    Sure, that's fine.  What did you say the

15   name of your supervisor was?

16       A.    Sergeant Parsons.

17       Q.    Parsons.  Is he the one who signed off on

18   your police report?  Do you recall?

19       A.    No, sir.  I don't know who it was, but it

20   wasn't him because I don't believe he was a sergeant

21   at the time.  What does it say at the bottom?

22   Sergeant Furman.

23       Q.    Furman.  Was that your sergeant at the time

24   of this incident?

25       A.    I don't think so.  I think he was one of the

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1   swing sergeants.  Obviously you have -- like I was

2   trying to explain to you earlier, on night shift you

3   have C Team, D Team.  I was on D Team.  D Team has a

4   assigned supervisor; C Team has assigned supervisor.

5          Swing sergeant comes in and could work

6   either shift or fill in for the sergeant whenever they

7   want off, so I don't know if he was my sergeant at the

8   time.

9       Q.   Okay.

10      A.   He may have been just filling in because I

11  know at one point he was, and then he became the swing

12  supervisor.

13      Q.   Okay.  When a supervisor signs off on one of

14  your reports, does that indicate that they've read and

15  approve of the report?

16      A.   Yes, sir.

17      Q.   Okay.  Does it indicate that they approve of

18  the arrest itself?

19      A.   Yes, sir.

20      Q.   Okay.

21      A.   I would assume.

22      Q.   Have you ever experienced a supervisor who

23  reads a report and then goes to the officer and says,

24  this was not a good arrest?

25      A.   No, sir.

Officer Caleb Gilbert
12/31/2014

Page 70

1        Q.    Okay.  Do your reports have to be reviewed
2    by the end of your shift?
3        A.    Yes, sir, I think so.  There are
4    circumstances, like I say, especially morning watch,
5    you're getting off late, and you can just turn in a
6    face sheet, which is basically the suspect, victim's
7    information, and then just a brief narrative of why --
8    what brought you into contact with the individual.
9        Q.    What role did Officer Cheek play in this
10   investigation?
11       A.    A back-up capacity.
12       Q.    Did he participate in the investigation at
13   all?
14       A.    Very limited.  No, sir, to the best of my
15   knowledge, he didn't participate in it.
16       Q.    Okay.  What other items did you find in Ms.
17   Schroeder's purse?  Do you have any recollection?
18       A.    No, sir.
19       Q.    What explanation did she provide for having
20   her husband's prescription medication?
21       A.    If I remember, the reason she had her
22   ex-husband's prescription was because, when they were
23   married, I believe that she would give those pills to
24   him whenever he was feeling anxious.
25       Q.    It was your understanding that they were

Officer Caleb Gilbert
12/31/2014

Page 71

1    divorced at the time of this incident?

2        A.   Yes, sir.  Well, soon to be divorced, to the

3    point where she has another boyfriend, kind of

4    thinking.

5        Q.   Married people have boyfriends all the time,

6    though; right?

7        A.   You're right.

8        Q.   Or girlfriends?

9        A.   Yes, sir.

10       Q.   Sometimes with approval; sometimes without.

11   Right?

12       A.   That's correct.

13       Q.   Could you pick up your report for me real

14   quick.

15       A.   Okay.  I'll use this one.

16       Q.   Whatever copy is fine.

17       A.   Okay.

18       Q.   If you could go to the narrative portion.

19       A.   Okay.

20       Q.   I believe what you wrote in there is:  A

21   traffic stop -- or a traffic violation was observed.

22   Let me see.  Yeah, the third sentence.

23            This violation was observed on Perimeter

24   Center West and Crown Pointe Parkway.

25       A.   Yes, sir.

Officer Caleb Gilbert
12/31/2014

1      Q.   Okay.  Are you familiar -- I'm probably

2    going to get an objection, but I just want to ask.

3    I've been dying to ask someone about this:  Do they

4    teach you guys to write in passive voice?

5                   MS. COWAN:  I don't know where you're

6          going, but I object to the form.

7                   You can answer the question to the extent

8          you can.

9    BY MR. FILIPOVITS:

10     Q.   Do they train you guys in the difference

11   between active voice and passive voice?

12     A.   Well, they don't train you, but I'm aware of

13   it.

14     Q.   It's just I read so many reports, and

15   they're always in passive voice to the point where I

16   don't know, reading it, who observed.  You know, you

17   say "the violation was observed."

18     A.   Explain it a little bit further as far as

19   what you're saying.

20     Q.   Well, if you write "this violation was

21   observed on Perimeter Center West," there is no

22   subject to that sentence.  If you say "I observed this

23   violation," there is a subject, and we know who

24   observed it.

25     A.   Okay.

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1        Q.    I was just curious because I encounter this

2    often.

3              You can object to all this if you want.

4              MS. COWAN:   I'm not sure it's relevant,

5        but it's fine.

6    BY MR. FILIPOVITS:

7        Q.    I was just curious if it was any attempt at

8    obfuscation.

9        A.    No, sir.

10       Q.    Okay.  All right.  It's the sort of thing

11   you can't ask in a trial, so I just need to ask all

12   this.  Let's see.  Have you been inside the DeKalb

13   County Jail?

14       A.    Yes, sir, I have.

15       Q.    In the area where the general population is

16   held?

17       A.    Not where general population is held, but

18   where people are in holding cells after being taken

19   into custody by the appropriate jurisdiction.

20       Q.    Okay.  Would it be fair to say you go there

21   often?

22       A.    Yes, sir.  More so on nights.  But now, on

23   day shift, they have transport officers, so I don't go

24   down there except on the weekends.

25       Q.    Okay.  Have you spoken with Officer Cheek

Officer Caleb Gilbert
12/31/2014

1    about this case at all?

2        A.   No, sir.

3        Q.   Do you have statistics or are you able to

4    get statistics on the number of arrests that you or

5    another officer with your department makes?

6        A.   I'm sure that they have those statistics

7    available, but they're not in a statistic form.  If I

8    wanted to see how many arrests I've had since I've

9    been at Dunwoody, I would have to put in a date.

10            But it's kind of a tedious process because,

11   say, I want to know what I've done this year as far as

12   arrests or incident reports that I've handled, I would

13   have to go in there, put in the date 12/01/2014 to

14   12/31/2014, and then go through there and count.

15            And some of them, I would just have to

16   assume through the name of the incident, yeah, there

17   was an arrest associated with it, yeah, there was a

18   report associated with it kind of thing.

19            And you'd have to do that for each month

20   counting, and then ultimately tallying, counting

21   arrests that you have for the --

22       Q.   So you're telling me you can only search by

23   month or you can only pull the data by month?

24       A.   What I'm aware of doing as far as --

25       Q.   Sure.

Officer Caleb Gilbert
12/31/2014

1      A.    That's how I would go about doing it.   Now,

2   there's probably other easier ways to go about doing

3   that, but none are -- I can't think of any.

4      Q.    Do you know if your supervisors or

5   commanders track arrest data or monitor how many

6   arrests each officer makes?

7      A.    I have no idea.

8      Q.    Okay.

9      A.    I will say I have seen stuff come out in

10  e-mail as far as an arrest, but it's so various that I

11  wouldn't be able to say that that's something they do

12  on a regular basis.

13     Q.    Do you get performance reviews?

14     A.    Yes, sir.

15     Q.    How often do those happen?

16     A.    Yearly.

17     Q.    And are you given some type of standardized

18  assessment in that review?

19     A.    If I'm not mistaken, it goes:  Exceeds,

20  meets standards, doesn't meet standards, and below

21  standards.  I think that's the four categories that

22  you can be listed as.

23     Q.    And are you ranked in a number of different

24  areas on each of those?

25     A.    Well, I think it's the -- ultimately, yes,

Officer Caleb Gilbert
12/31/2014

1    but it boils down to one ranking.

2        Q.   Okay.  So you're ranked in a number of

3    areas, but you get one overall ranking?

4        A.   Right, yes, sir.

5        Q.   How many different areas would you say that

6    you guys get ranked in?

7        A.   I have no idea.

8        Q.   I mean, is it five?  Is it a hundred?

9        A.   Well, it's obviously less than a hundred.  I

10   think the way in which -- I think it's circumstantial

11   to the officer, so as far as -- I have no idea how

12   they do it.

13       Q.   Okay.  Who conducts that review?  Is it the

14   sergeant or the lieutenant?

15       A.   I believe the sergeant does the initial

16   review, kicks up the chain of command to the

17   lieutenant, deputy chief, and chief.

18       Q.   When did you do your drug recognition expert

19   training?

20       A.   2011 to 2012.

21       Q.   Do you recall telling the occupants of the

22   car during your investigation that you weren't

23   interested in a small quantity of marijuana and that

24   it was typically a traffic citation in the state?

25       A.   Yes, sir.

Officer Caleb Gilbert
12/31/2014

1      Q.    Is that how the City of Dunwoody typically

2   deals with marijuana possession?

3      A.    Yes, sir.  You're issued a citation and

4   taken to jail, and you have to post a cash bond to get

5   out.

6      Q.    Okay.  So you are arrested?  It's not simply

7   a citation?

8      A.    Well, you're given a citation, yes, sir.

9      Q.    But you're also arrested; right?

10      A.    Yes, sir.

11      Q.    Although you have the option of only issuing

12   a citation?

13      A.    Uh-uh (negative).

14      Q.    You don't?

15      A.    No, sir.

16      Q.    Is that because of department policy?

17      A.    I don't know how that works, but I've always

18   been told you cannot -- actually, I believe that it's

19   state law.  It's one that you have to post a cash bond

20   on.

21           Obviously there is circumstances which would

22   dictate otherwise, but I'm pretty sure that's listed

23   on the back of a citation as far as those that you

24   have to post cash bonds for.

25      Q.    And the offense we're talking about here

Officer Caleb Gilbert
12/31/2014

1   would be misdemeanor possession, lesser amounts?

2        A.   Yes, sir.

3        Q.   Is that also true -- is there a municipal

4   ordinance that also covers possession of marijuana?

5        A.   There may be, but I always issue it under

6   state.

7        Q.   Okay.  Do they provide any guidance to you

8   with regard to whether the charge is state or

9   municipal?

10       A.   Not that I'm aware of or been told.

11       Q.   You guys do have a Municipal Court system;

12   right?

13       A.   We do, sir.

14            MR. FILIPOVITS:  I think I'm done, but

15       give me two minutes.

16            (Pause in proceedings.)

17   BY MR. FILIPOVITS:

18       Q.   Do you recall exactly where you detected the

19   faint odor of marijuana when you were searching the

20   vehicle or when you were near the vehicle?

21       A.   On the passenger side of the vehicle.

22       Q.   Did you narrow it down beyond that?

23       A.   Not that I recall.

24       Q.   Okay.  Are you confident that you performed

25   a thorough search?

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

1      A.    To the best of my ability.

2      Q.    At what point did you make the decision to

3   place Ms. Schroeder under arrest?

4      A.    Once I located the pills and was able to

5   conduct a investigation.  Based on those, with the

6   circumstances that I mentioned earlier, when I was

7   able to consider those with the fact she was in

8   possession of it, that's when I decided to make the

9   arrest.

10     Q.    Okay.  But you didn't place her in handcuffs

11  at that point; correct?

12     A.    No, sir.

13     Q.    Did she reveal any incriminating information

14  to you during the conversation on the way to the jail?

15     A.    When we got to the jail, she stated that:  I

16  was in possession of the pills, and I'll admit that

17  was wrong.  I believe that was her exact words.

18     Q.    Okay.  Aside from that, anything else that

19  you recall?

20     A.    Not that I recall, sir.

21          MR. FILIPOVITS:  All right.  Well, as

22       enjoyable as this has been, I'm afraid I don't

23       have any more questions.  Thanks for your time.

24          THE WITNESS:  Yes, sir.  Thank you.

25          (Deposition concluded at 10:46 a.m.)

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

```
 1                         DISCLOSURE
 2    STATE OF GEORGIA
 3    COUNTY OF COBB
 4    DEPOSITION OF:  OFFICER CALEB GILBERT
 5              Pursuant to Article 8.B. of the Rules and
      Regulations of the Board of Court Reporting of the
 6    Judicial Council of Georgia, I make the following
      disclosure:
 7
              I am a Georgia Certified Court Reporter.  I
 8    am here as an independent contractor for American
      Court Reporting Company, Inc.,
 9
              The firm was contacted by the offices of
10    Jeffrey Filipovits to provide court reporting services
      for this deposition.  The firm will not be taking this
11    deposition under any contract that is prohibited by
      O.C.G.A. 15-14-37(a) and (b).
12
      Option A:  The firm has no contract/agreement to
13    provide reporting services with any party to the case,
      any counsel in the case, or any reporter or reporting
14    agency from whom a referral might have been made to
      cover this deposition.  The firm will charge its usual
15    and customary rates to all parties in the case, and a
      financial discount will not be given to any party to
16    this litigation.
17    (Signature of Attorneys optional)
18
      _____       January 13, 2015
19    PATRICIA M. LESCH, CCR B-2435
20
      _____       _____
21    Attorney for Plaintiff                 Date:
22
      _____       _____
23    Attorney for Defendant                 Date:
24
25
```

American Court Reporting Company, Inc.
404-892-1331

Officer Caleb Gilbert
12/31/2014

Page 81

```
 1                    C E R T I F I C A T E

 2    STATE OF GEORGIA   )

 3    COUNTY OF COBB     )

 4

 5        I hereby certify that the foregoing transcript

 6    was taken down, as stated in the caption, and the

 7    proceedings were reduced to typewriting under my

 8    direction and control.

 9        I further certify that the transcript is a true

10    and correct record of the evidence given at the said

11    proceedings.

12        I further certify that I am neither a relative or

13    employee or attorney or counsel to any of the parties,

14    nor financially interested or otherwise interested in

15    this matter.

16        This the 13th day of January, 2015.

17

18

19                              _____

20                              PATRICIA M. LESCH, CCR B-2435

21

22

23

24

25
```

American Court Reporting Company, Inc.
404-892-1331

```
 1              E R R A T A   S H E E T
 2    IN RE:  SCHROEDER vs. GILBERT
 3    DEPOSITION TAKEN ON:  DECEMBER 31, 2014
 4
 5    I have read the transcript of my deposition and find
 6    that no changes are necessary  _____.
 7    Having read the transcript of my deposition, I wish to
 8    make the following changes:  (Please state reason.)
 9
      Page _____, Line _____: _____
10
      Page _____, Line _____: _____
11
      Page _____, Line _____: _____
12
      Page _____, Line _____: _____
13
      Page _____, Line _____: _____
14
      Page _____, Line _____: _____
15
16
17
      _____, OFFICER CALEB GILBERT,
18
      Sworn to and subscribed before me, this the ____ day
19
      of _____, 2015; _____,
20
      County, Georgia.
21
22
      _____, Notary Public
23
24
25    My commission expires:  _____
```